FRANCIS J. LYONS, administrator, *vs.* PATRICK A. TODINA.

Middlesex.    April 5, 1940. — September 12, 1940.

Present: FIELD, C.J., DONAHUE, LUMMUS, QUA, & RONAN, JJ.

*Negligence*, Motor vehicle, Gross.

A finding of gross negligence of the operator of an automobile was warranted by evidence that after dark in the summer he was driving on a main highway, without having turned on his lights, at a speed of from forty-five to fifty miles per hour when, for the first time seeing an automobile twenty-five feet in front of him, he turned seven feet from the road at his right, returned to the road eighty-five feet further on and tipped over, facing in the direction from which he had come.

TORT. Writ in the First District Court of Eastern Middlesex dated September 11, 1937.

On removal to the Superior Court, the action was tried before *Dillon*, J.

The first count of the declaration was waived. The judge subject to exception by the defendant denied a motion that he order a verdict for the defendant on the second count, which sought damages for conscious suffering of the plaintiff's intestate. The jury found for the plaintiff on that count in the sum of $1,200. On the third count, for causing death, there was a verdict for the plaintiff in the sum of $4,500. The judge reported the action.

*J. M. Graham*, for the defendant.

*J. Finnegan*, for the plaintiff.

QUA, J. The question is whether there was any evidence of gross negligence to support a verdict for the plaintiff on his count for the conscious suffering of his intestate. The deceased was a passenger in an automobile driven by the defendant on "Concord Turnpike" in Lincoln on July 29, 1937, at about 9:10 P.M., when the automobile ran off the road, and in returning to the road, tipped, rolled over twice, and stopped on its side, facing in the direction from which it had come.

There was evidence tending to show that the automobile left its right hand side of the straight, level, four-lane cement highway in front of or near a "vegetable stand," so that the left wheels went as far as seven feet off the edge of the road. The wheel marks on the ground described an arc about eighty-five feet long from the road back to the road again with "scrape marks" on the road itself extending about twenty feet farther to the place where the automobile was found. The entrance to the stand where the marks were "was about one hundred feet," and the surface was of hard gravel or dirt, level with the roadway. It was a "nice clear summer's night." The highest estimate of the defendant's speed was "about forty-five or fifty miles an hour."

A State police officer testified that he went to the scene of the accident and talked with the defendant; that the lights on the defendant's automobile were not lighted and the switch was on; that he himself turned the lights on and the switch off. The defendant testified that he stayed about five minutes at the place of the accident, and paid no attention to his automobile after it tipped over; that it was dark enough for headlights; that his headlights were lighted; that with his headlights on he could see one hundred sixty feet; but that he did not see the automobile ahead of him hereinafter mentioned until he was about twenty-five feet from it.

The defendant's story of the accident was that while travelling thirty-five or forty miles an hour in the right hand lane he saw an automobile, which had "apparently" come from the opposite direction, making a "U-turn" in front

of him to go in the same direction in which he was going; that when he saw this automobile it was right across his lane of travel headed toward the woods at his right side of the road and going "very, very slowly," if it was moving at all; that he turned to the right off the road, and his "front tire blew"; that he tipped over in turning back upon the road beyond this automobile; that he saw no lights on the automobile that was across his path. He told the police officer that its headlights "were headed into the woods so that it was not visible in the dark."

The meaning of the evidence as it appears in the report is not clear at all points. There was some evidence from which the jury might well have found that considerable time had elapsed before the police officer, as he testified, arrived at the scene and turned on the defendant's headlights, so that the lights might have been tampered with before he came. But upon the evidence already narrated, including the defendant's failure to see an automoible in front of him until he was twenty-five feet from it, we cannot quite say as a matter of law that there was no evidence for the jury that the defendant was driving without lights. The probabilities are not for us to decide.

There was somewhat conflicting evidence as to the degree of darkness at the time, but in addition to evidence that it was "dark" we may draw upon our own knowledge that in this latitude very little daylight remains at about 9:10 P.M. on July 29. The sun had set over an hour before. We cannot say as matter of law that it is not grossly negligent to drive without turning on lights on a main highway in darkness substantially that of night at a speed of from forty-five to fifty miles an hour and to run off the road under the circumstances which could here be found. Failure to use the lights is more than a momentary lapse of care. We think this case distinguishable from *Lynch* v. *Springfield Safe Deposit & Trust Co.* 294 Mass. 170, and from the cases relied upon by the defendant.

*Judgment on the verdicts.*